**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| NANCY E. MCMILLAN, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No. | 4:11-CV-1948-NAB |
| | ) | | |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM AND ORDER**

This is an action under Title 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Nancy E. McMillan's ("McMillan") applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  McMillan alleges disability due to depression, diabetes, obstructive sleep apnea, neuropathy, and edema. (Tr. 40, 267.)  For the reasons set forth below, the Administrative Law Judge's ("ALJ") decision will be affirmed.

**I.     PROCEDURAL BACKGROUND**

On March 11, 2009, McMillan completed a Title II application for a period of disability and DIB and a Title XVI application for SSI. (Tr. 182, 189.)  She alleges an onset date of August 22, 2007. (Tr. 35.)  The Social Security Administration initially denied McMillan's claims on June 3, 2009, and she timely filed a written request for hearing on July 6, 2009. (Tr. 91-95, 97.)  A hearing was scheduled for May 20, 2010, but was continued until September 28, 2010 so that McMillan could obtain representation. (Tr. 72-78.)  On September 28, 2010, McMillan appeared and testified at a hearing in St. Louis, Missouri. (Tr. 58-68.)  An impartial vocational expert

("VE"), Matthew C. Lampley ("Lampley"), also testified via telephone during the hearing. (Tr. 16.)  On January 28, 2011, the Administrative Law Judge ("ALJ") issued a written opinion upholding the Social Security Administration's denial of benefits. (Tr. 13-24.)  On March 14, 2011, McMillan filed a request for review of the ALJ's hearing decision. (Tr. 6-11.)  The Appeals Council declined to review the decision of the ALJ. (Tr. 1-5.)  The ALJ's decision thus stands as the final decision of the Commissioner.  McMillan filed this appeal on November 8, 2011.

## II.     DECISION OF THE ALJ

The ALJ found that McMillan met the insured status requirements through March 31, 2011. (Tr. 18.)  The ALJ found that McMillan had not engaged in substantial gainful activity since August 22, 2007, the alleged onset date. (Tr. 18.)  The ALJ found that she had the severe impairments of obesity, obstructive sleep apnea, diabetes mellitus, neuropathy since April 2010, carpal tunnel syndrome, depression, and post-traumatic stress disorder. (Tr. 18.)  The ALJ found that McMillan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19.)  The ALJ determined that McMillan had the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  (Tr. 20.)  He found that she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for a total of 6 hours in an 8-hour day; and sit for a total of 6 hours in an 8-hour day; but she would need to change positions for 1-2 minutes every hour.  (Tr. 20.)  She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but she cannot climb ladders, ropes, or scaffolds. (Tr. 20.)  She can occasionally perform handling and fingering bilaterally.  (Tr. 20.)  Due to her mental impairments, the claimant is limited to simple routine

tasks.  (Tr. 20.)  Based upon McMillan's RFC, the ALJ found that she could not perform any past relevant work.  (Tr. 22.)  Considering McMillan's age, education, work experience, and RFC, however, the ALJ determined that there are jobs that exist in significant numbers in the national economy that McMillan could perform.  (Tr. 23.)  Thus the ALJ found McMillan was not disabled under the meaning of the Social Security Act. (Tr. 24.)

### III.    ADMINISTRATIVE RECORD

**A.    Hearing Testimony**

The ALJ heard testimony from McMillan, who was represented by an attorney, and vocational expert Matthew Lampley. (Tr. 35-57.)

**1.    Claimant's Testimony**

McMillan testified as follows.  She graduated from high school and had some college credits, but had not obtained a post-secondary education degree.  (Tr. 35-36.)  She is single and has two adult children, aged eighteen (18) and twenty-four (24).  (Tr. 36.)  At the time of the hearing, her only income was in the form of child support payments for one of her children.  (Tr. 36.)  McMillan also receives Medicaid. (Tr. 36.)

Since 1995, she has worked as a porter, janitor, home health aide, cashier, assistant manager at a restaurant, and a phone operator for an adult phone service.  (Tr. 36-37.)  She testified that, with the exception of being a phone operator, her past work required her to stand and walk all day, and lift more than twenty (20) pounds.  (Tr. 38.)  Her most recent job was at Mitch Mertz Maintenance ("Mertz"), beginning August 13, 2009.  (Tr. 39.)  At Mertz, McMillan served as a janitor at a private school.  (Tr. 39.)  McMillan testified that she worked twenty-five (25) hours per week at Mertz and was required to lift close to one-hundred (100) pounds.  (Tr.

39.)  McMillan testified that she had to stop working in May or June of 2010 because her diabetes, neuropathy, and edema prevented her from performing her job duties. (Tr. 40.)

McMillan testified that she has pain in her back, fingers, and face.  (Tr. 42.)  She has a facial tick that is exacerbated by her sleep apnea.  (Tr. 42.)  She gets less than four (4) hours of sleep a night and does not find that CPAP therapy helps her fatigue.  (Tr. 42.)  McMillan has been going to a psychiatrist for depression and post-traumatic stress disorder ("PTSD") since 2005.  (Tr. 43-44.)  She testified that these mental conditions prevent her from being in public or dealing with social situations.  (Tr. 44.)  She cannot motivate herself to get out of bed in the morning because of her depression and has lost jobs in the past because she failed to come to work.  (Tr. 44-45.)  Medication has reduced her depression to some degree.  (Tr. 45.)

McMillan testified that her diabetes has caused her to gain forty (40) to fifty (50) pounds in the past year.  (Tr. 47.)  Stress causes her to lose concentration and she rarely leaves the house. (Tr. 48.)  When she does leave the house, the stress of the situation often leads to panic or anxiety attacks.  (Tr. 49.)  She has experienced mood swings in the past and also has issues getting along with her supervisors and co-workers.  (Tr. 49-50.)  McMillan testified that she has trouble taking orders from others because of sexual and verbal abuse she suffered as a child, two rapes as an adult, and robbery and assaults.  (Tr. 50-51.)  She has frequent nightmares about this abuse and has attempted suicide in the past. (Tr. 51-52.)

McMillan has swelling in her hands and feet two to three times per week.  (Tr. 40.)  She testified that she could sit in a chair for a couple hours at a time before she experiences painful swelling in her feet and ankles, or hands and wrists if she is using a computer.  (Tr. 53.)  She is only able to stand in one spot for twenty (20) to thirty (30) minutes before she becomes too fatigued to stand.  (Tr. 53-54.)  She has trouble manipulating small objects and cannot write with

4

a pen for an extended period of time.  (Tr. 54-55.)  She has trouble lifting things, especially if they are on the ground and she must bend over to pick them up.  (Tr. 54, 56.)

2.    **VE Mathew C. Lampley's Testimony**

The ALJ first asked the VE to classify McMillan's past work in terms of job titles, skill level, exertional level, and duties. (Tr. 58-59.)  The VE was able to identify several of her past occupations in the *Dictionary of Occupational Titles* ("DOT"), and he provided the specific vocational preparation ("SVP") level for each position.[1] (Tr. 59.)

The VE testified that McMillan's work as a janitor required medium exertion with an SVP of 3.  (Tr. 59.)  Her work as a cashier required light exertion with an SVP of 2.  (Tr. 59.)  Her work as a home attendant required light to medium exertion with an SVP of 3.  (Tr. 59.)  The VE opined that he could not match her work as a phone operator to an exact entry in the DOT. (Tr. 59.)

The ALJ posed three hypotheticals to the VE.  (*See* Tr. 60-61.)  He first asked about an individual who was under the age of 50; with a twelfth grade education, who could lift and carry twenty (20) pounds occasionally and ten (10) pounds frequently; stand and walk for a total of six hours in an eight hour block of time; sit for a total of six hours in an eight hour block of time; but would need to change position for a minute or two every hour; occasionally balance, stoop, kneel, crouch, crawl, and climb "lamp [sic], ramps and stairs," but not ladders, ropes, and scaffolds; and perform simple, routine tasks.  (Tr. 59.)  The VE opined that such an individual would be able to perform the jobs of a "sorter," "racker," or "grinder," all of which are classified as light exertional level jobs with an SVP of 2.  (Tr. 62.)

---

[1] An SVP of 1-2 reflects unskilled work, an SVP of 3-4 reflects semi-skilled work, and an SVP of 5-9 reflects skilled work. SSR 00-4p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000).

The ALJ next asked about an individual with the same restrictions and abilities of the first hypothetical, in addition to occasional handling and fingering abilities in both hands.  (Tr. 61, 62.)  The ALJ opined that such an individual could be employed as a "linen grader" or "press operator." (Tr. 63.)

Finally, the ALJ asked about an individual with the same restrictions and abilities as in the first hypothetical, with the added capability to perform tasks that can be performed independently, primarily working with things rather than people; involving only occasional, superficial interaction with supervisors and co-workers; and no direct interaction with the general public.  (Tr. 61.)  The VE opined that this individual could also be employed as a "linen grader" or "press operator." (Tr. 64.)

The VE stated that these occupations customarily permit thirty (30) minutes of breaks each day, thirty (30) to sixty (60) minutes for lunch, and twelve (12) absences from work each year.  (Tr. 65.)  Further, an individual can be off task for approximately ten percent (10%) of their work day and still perform these occupations.  (Tr. 65.)  The VE also noted that these hypothetical individuals could not perform these jobs if they needed to elevate their feet or legs into a horizontal position. (Tr. 65.)

The VE indicated that the jobs identified did not provide the option to choose between sitting and standing at will throughout the day.  (Tr. 66.)  Additionally, if the hypothetical claimant was limited to occasional fine fingering, feeling and only occasional grasping and handling with both hands, the named positions would not be available.  (Tr. 66.)  However, the VE indicated, with regard to the ALJ's first hypothetical, the positions of "electronic assembler" and "table worker" would be available to a claimant requiring the option of sitting and standing

at will.  (Tr. 67.)   Both of these positions are sedentary exertional level jobs, and a "table worker" requires an SVP of 2.  (Tr. 67.)

## B.    Medical Records

On May 24, 2005, McMillan received treatment in the Barnes Jewish Hospital emergency room complaining of back pain.  (Tr. 373.)  After x-ray examination, she was diagnosed with a backache and back strain.  (Tr. 374.)  The treating physician gave her a note permitting her to miss work for four (4) days.  (Tr. 374.)

On June 14, 2005, McMillan went to the Barnes Jewish Hospital complaining of lower back pain.  (Tr. 393.)  An x-ray of her back indicated mild levoscoliosis[2] of the lower lumber spine.  (Tr. 398.)

On August 16, 2005, McMillan received a chest radiograph at Barnes Jewish Hospital showing a mildly enlarged heart, mild pulmonary vascular redistribution, and a prominent azygos vein[3] shadow[4]. (Tr. 397.)  The attending radiologist, Dennis Balfe, M.D., concluded that these symptoms are indicative of venous congestion that is normal in the context of pregnancy. (Tr. 397.)

On January 1, 2006, McMillan was seen at Barnes Jewish Hospital for lower back pain. (Tr. 388.)  She complained of significant pain in the lower back and bottom of her feet.  (Tr. 388.)  The examining physician, Dr. Demeatzis, opined that her "pain [was] likely…although not detected on imaging."  (Tr. 388.)   Dr. Demeatzis diagnosed McMillan with carpal tunnel

---

[2] An abnormal lateral and rotational curvature of the left vertebral column. Stedman's Medical Dictionary 994, 1606 (27th ed. 2000).
[3] Vein arising from the merger of the right ascending lumbar vein and the right subcostal vein which ascends along the right side of the thoracic vertebral bodies in the posterior mediastinum and terminates by arching anteriorly over the root of the right lung to enter the posterior aspect of the superior vena cava. *Stedman's Medical Dictionary* 1937 (27th ed. 2000).
[4] A surface area defined by the interception of x-rays by a body. *Stedman's Medical Dictionary* 1626 (27th ed. 2000).

syndrome and recommended nocturnal wrist splints.  (Tr. 388.)  She further recommended that McMillan lose weight, referring her to a nutritionist and the "Fit for Life" program.  The doctor also recommended she stop smoking, referring her to the "Freedom from Smoking" program. (Tr. 388.)

Between August 3, 2006 and November 12, 2008, McMillan received three separate psychiatric assessments at the Barnes Jewish Behavioral Health Center. (Tr. 419-431.)   On August 3, 2006, she was examined by Ottavio Vitolo, M.D. ("Dr. Vitolo").  (Tr. 427-431.)  Dr. Vitolo found her affective symptoms to be consistent with major depressive disorder.  (Tr. 429.) However, he did not find any evidence of any history of manic symptoms that would justify a diagnosis of Bipolar Disorder.  (Tr. 429.)  He also opined that McMillan did not appear to be using illegal drugs at that time, and he did not find her ticks to meet the criteria for Tourette's syndrome.  (Tr. 429-430.)  Dr. Vitolo recommended, and McMillan agreed, that she should continue with her current medication.   (Tr. 430.)   She was referred to a neurologist and encouraged to continue working. (Tr. 430.)

On October 10, 2007, McMillan was examined by Mina Charepoo, M.D. ("Dr. Charepoo").   (Tr. 423-426.)   Dr. Charepoo also concluded that McMillan had affective symptoms consistent with major depressive disorder.  (Tr. 425.)  Despite a history of mood lability and impulsivity, Dr. Charepoo found no evidence of mania that would justify a diagnosis of bipolar disorder.  (Tr. 425.)  Dr. Charepoo also believed McMillan's drug use had been inactive for sixteen years and found McMillan appropriate for outpatient care.  (Tr. 425.)  Dr. Charepoo continued McMillan on Celexa.  (Tr. 426.)  The doctor also set an appointment for her to receive counseling.  (Tr. 426.)

On November 12, 2008, McMillan was again examined at the Barnes Jewish Behavioral Health Center by Dr. Megan Shabbing.  (Tr. 419-421, 439-440.)  This assessment indicates that McMillan switched from Celexa to a combination of Cymbalta and Abilify.   (Tr. 420.) McMillan acknowledged that she has "done better" on this combination of medications, such that she only has a "low mood" a few days per month, as opposed to a few weeks per month.  (Tr. 420.)  McMillan denied poor psychotic symptoms, claimed that she had been enjoying work, and was even thinking about going back to school.  (Tr. 420.)  During these sessions, no psychiatrist diagnosed McMillan as manic or bipolar. (*See* Tr. 419-431.)  She did not appear suicidal and appeared to have her drug dependency issues under control, despite a history of suicidal behavior and drug dependence. (Tr. 427, 429.) Further, each psychiatrist concluded, and McMillan agreed, that her medication helped moderate her depression, and it was recommended that McMillan continue with that course of treatment. (Tr. 420, 426, 430.)

On October 30, 2006, Jay Piccirillo, M.D. ("Dr. Piccirillo") was asked by Beth Ward, M.D. ("Dr. Ward") to render an opinion as to whether McMillan would benefit from ENT surgery. (Tr. 341.)  Dr. Piccirillo's opinion was that McMillan had severe obstructive sleep apnea.  (Tr. 341.)  Because of McMillan's weight, the severity of her apnea, and his finding that her entire airway collapsed during the Mueller maneuver[5], Dr. Piccirillo did not believe pharyngeal surgery would be successful.  (Tr. 341.)  He requested McMillan seek follow-up with Dr. Ward for further medical treatment.  (Tr. 341.)

On April 17, 2007, McMillan sought treatment at the Barnes Jewish Hospital emergency room complaining of urinary frequency. (Tr. 349.)  As a result of this visit, McMillan's blood

---

[5] After a forced expiration, an attempt at inspiration is made with closed mouth and nose or closed glottis, whereby the negative pressure in the chest and lungs is made very subatmospheric. *Stedman's Medical Dictionary* 1061 (27th ed. 2000).

sugar was found to be high enough such that she was treated for hyperglycemia.  (Tr. 352, 354.)
Subsequently, between April 23, 2007 and May 7, 2007, McMillan was treated at Barnes Jewish
Hospital for diabetes mellitus II and hyperlipidemia.  (Tr. 382, 386.)  McMillan admitted to
being non-compliant with previously recommended dietary restrictions, but agreed to meet again
with a diabetes educator.  (Tr. 382.)  McMillan also reported intermittent burning in her left foot
and was told to follow up with a foot clinic.  (Tr. 382.)

On August 17, 2007 and June 2, 2009, McMillan's mental functional capacity was
assessed by different state psychiatric consultants. (*See* 405, 461.) The most recent evaluation
was conducted by Dr. Robert Cottone ("Dr. Cottone").  Dr. Cottone relied upon the notes of
McMillan's psychiatrists in forming his opinion, including the November 2008 opinion of Dr.
Megan Shabbing, and another medical opinion dated April 29, 2009.  (Tr. 471.)  These opinions
indicated major depressive disorder, moderate impairment in daily living activities, moderate
impairment of concentration, persistence, or pace, and mild social functioning limitations.  (Tr.
471.)  After reviewing McMillan's file, Dr. Cottone concluded that McMillan was markedly
limited in her ability to understand, remember, and carryout detailed instructions.  (Tr. 472.)
Additionally, she was moderately limited in her ability to concentrate for extended periods, avoid
interruptions, perform at a consistent pace without unreasonable rest, accept instructions, and
respond appropriately to criticism.  (Tr. 472-473.)  Dr. Cottone concluded under the "B" criteria
for functional limitation, that as a result of her mental disorders, McMillan had moderate
restrictions to daily living activities; mild difficulties in maintaining social functioning; moderate
difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of
decompensation, each of extended duration. (Tr. 469.)  Pursuant to these findings, Dr. Cottone
concluded that McMillan had the functional capacity to understand, remember, carry out, and

10

persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting.  (Tr. 474.)

On July 18, 2007 and October 2, 2007, McMillan visited Barnes Jewish Hospital for a check up on her blood sugar. (Tr. 614, 619.)  She also complained of shortness-of-breath, chest pain, and numbness in her legs. (Tr. 614, 619.)  She was advised of the dangers of smoking, but indicated that she was not interested in quitting. (Tr. 614, 619.)  While her medication had been working earlier, she reported increased episodes of hypoglycemia in October.  (Tr. 615.)  She was again advised to follow-up with a diabetic foot clinic. (Tr. 616, 621.)

On August 7, 2008, McMillan returned to Barnes Jewish Hospital for evaluation of her weight gain that occurred after she changed antidepressants.  (Tr. 607.)  However, McMillan also admitted that she had stopped consistently checking her blood glucose levels and stopped taking one of her medications.  (Tr. 607.)  She was advised to follow-up with a dietician, diabetic educator, and a diabetic foot clinic.  (Tr. 608-609.)  McMillan followed-up on this appointment on September 10, 2008 and indicated that in limiting her sugar intake, her blood glucose was under control and routinely within her goal range.  (Tr. 594-595.)  At this time, McMillan had still not sought treatment at the diabetic foot clinic.  (Tr. 595.)

On February 14, 2010, McMillan went to the emergency room at Barnes Jewish Hospital complaining of high blood sugar and swelling in her feet and ankles.  (Tr. 515.)  She was treated for hyperglycemia and non-pitting edema.  (Tr. 521.)  McMillan asked for a work note because she said she could not work while swollen.  (Tr. 521.)  She was advised to quit smoking and follow-up with her primary care physician.  (Tr. 521, 531.)

On June 11, 2010, McMillan scheduled a follow-up with Barnes Jewish Behavioral Health Center where she indicated that she stopped working in May because of her worsening

11

neuropathy. (Tr. 638.)  She had issues with swelling in her feet and ankles and was stressed at home because of her son and boyfriend.  (Tr. 638.)  The physician noted that her concentration was good, she was free of psychosis, and had positive goals for the future. (Tr. 638.)

Between April 1, 2010 and May 12, 2010, McMillan went to Barnes Jewish Hospital with concerns over her diabetes, ankle swelling, elbow pain, and neuropathy.  (Tr. 488, 496, 503.)  McMillan indicated that the treatment she received for swelling had been effective, so the physician continued to prescribe the same medication.  (Tr. 490, 506.)  Additionally, she was referred to a diabetes educator and prescribed medication for her neuropathy. (Tr. 490.)

## IV.   STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[6] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform

---

[6] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.  See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole.  *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence.  *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984).  In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed

because the reviewing court would have decided the case differently.  *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).  The factual findings of the ALJ are conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g).   The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  Additionally, an ALJ's decision must comply "with the relevant legal requirements."  *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

## V.      DISCUSSION

McMillan makes several arguments on appeal. She alleges that the ALJ erred by failing to consider her obesity in making his RFC determination, discrediting her testimony, giving substantial weight to Dr. Cottone's opinion, and finally that the decision was conclusory. Because the ALJ's decision was supported by substantial evidence, the decision will be affirmed.

## A.      The ALJ's Failure to Discuss Obesity in the Opinion.

McMillan alleges that the ALJ erred in failing to discuss her obesity when determining her RFC. McMillan is correct that even though obesity is not a listed impairment, the ALJ must consider her functional limitations as a result of obesity when making a RFC determination. *See* SSR 02-1p.  However, while "required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."  *Wildman v. Astrue*, 596 F.3d 959, 966 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Id.* (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

While the ALJ may have failed to extensively discuss obesity with regard to McMillan's RFC, it is clear that he considered its effects.  The ALJ found obesity to be one of McMillan's "severe impairments." (Tr. 18.)  "As with any other medical condition…obesity is a severe impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic

work activities." SSR 02-1p. (internal quotations omitted)  Also considered are "the effects of any symptoms (such as pain or fatigue) that could limit functioning." SSR 02-1p. (See also SSR 85-28, "Titles II and XVI: Medical Impairments That Are Not Severe" and SSR 96-3p, "Titles II and XVI: Considering Allegations of Pain and Other Symptoms In Determining Whether a Medically Determinable Impairment Is Severe.") An individualized assessment of the impact of obesity on an individual's functioning is required to decide whether the impairment is severe. SSR 02-1p.

Therefore, in concluding that McMillan's obesity was "severe," the ALJ must not only have considered McMillan's obesity in making his determination, but found it sufficiently limiting to her functional capacity that he would classify it as severe. (*See* Tr. 18.)  Because it is "severe," the ALJ agreed with McMillan that her obesity "significantly limits… [her] ability to do basic work activities." *See* SSR 02-1p.  The ALJ, therefore, not only considered McMillan's obesity, but expressly stated that it affected his RFC determination.  He concluded, nonetheless, that even with these limitations, "[t]he overall record shows [McMillan] is capable of [a] range of light, unskilled work." (Tr. 21.)  Therefore, because the ALJ considered McMillan's obesity, he did not err in failing to discuss it further.

**B.     The ALJ's Evaluation of McMillan's Credibility.**

McMillan next alleges that the ALJ failed to properly consider her subjective complaints. A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and

observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness, and side effects of any medication; and (5) the claimant's functional restrictions. *Id.*

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence."  *Id.*  The ALJ, however, "need not explicitly discuss each *Polaski* factor."  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  *Id.*  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

Here, the ALJ determined that McMillan's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (Tr. 21.)  In support of this, he opined that the medical evidence indicated that her impairments were not as limiting as she alleged and many had been effectively treated. (Tr. 21.)

18

For example, McMillan has "obstructive sleep apnea, but the medical records indicate that it is effectively treated with a CPAP machine. (Tr. 343.) She has bilateral carpal tunnel syndrome and was given nocturnal wrist splints, but she has not required surgery. (Tr. 388.)  She is obese and has worked to lose weight through diet and increased control of her diabetes. (Tr. 595.)  McMillan, however, admitted to being non-compliant with previously recommended dietary restrictions and clinical follow-ups. (Tr. 382, 349.)  She further routinely failed to follow-up with a foot specialist despite her physicians' advice. (*See* Tr. 382, 595, 608, 616.)  While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem. *Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995)).

The ALJ indicated that her type II diabetes mellitus is non-insulin dependent and has been generally controlled with medication. (*See* Tr. 382, 386.) The swelling in her hands and feet was also well controlled with medication. (Tr. 488, 490, 506.)  McMillan's depression has been effectively treated with medication, and her progress notes indicate her symptoms have been stable. (*See* Tr. 417-460, 475-482, 633-636, 637-638.) Further, despite an alleged onset date in 2007, McMillan did not stop working until May or June of 2010. (Tr. 40.)

This is substantial evidence such that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

## C.    Substantial Weight Given to Dr. Cottone's Opinion.

McMillan next contends that the ALJ erred in giving substantial weight to Dr. Cottone's opinion. McMillan contends Dr. Cottone's opinion is not entitled to substantial weight because Dr. Cottone was a nonexamining physician, and his opinion was both dated and inconsistent with the findings of the ALJ.

19

While nonexamining physician's opinions are not generally given controlling weight, the weight given to any medical opinion is determined by several factors, including whether the physician examined the patient, whether the physician treated the patient, the explanation given for the physician's diagnosis, the consistency of the physician's opinion with the record as a whole, the physician's specialization in the field, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).

"When an administrative law judge considers findings of a [nonexamining] State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors [described above] such as the consultant's medical specialty and expertise in the SSA's rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).   Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the state.] 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).   Because the ALJ did not give controlling weight to another physician, it is appropriate for him to identify the amount of weight given to the opinion

20

of Dr. Cottone.  Dr. Cottone's opinion is consistent with the record as a whole, as well as other psychological evaluations.  Further, McMillan does not proffer any recent psychiatric evaluation that contradicts the findings of Dr. Cottone, and no examining psychiatrist found marked disability in McMillan.

Because of Dr. Cottone's credentials as a state agency psychological consultant, and his evaluation which is consistent with substantial evidence in the record as a whole, it is not error for the ALJ to give his opinion substantial weight.

**D.    Conclusory Nature of the Decision and Reference to Supporting Evidence as Required by SSR 96-8p.**

McMillan finally contends that the ALJ did not base his decision on, nor reference, relevant medical evidence when determining her RFC.  This contention is not supported by the record.

The ALJ specifically referenced medical treatment received by McMillan, which lead him to conclude she had several severe impairments. (Tr. 18.)  He specifically references the treatment records considered in making his determination, as discussed previously. (*See* Tr. 18-19) After reviewing the records and McMillan's testimony, the ALJ agreed that McMillan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 21.)  Therefore, she does not fail this assessment because she does not suffer from medically determinable impairments, but rather, she fails because she can perform light work *despite* these impairments.

McMillan contends that the ALJ concluded she could perform light work without any explanation as to how he reached this conclusion.  The ALJ indicates that he made this determination from McMillan's testimony as to her limitations as well as the relevant medical

21

evidence. (Tr. 20-21.)    He expressly identified her limitations and concluded that these limitations do not prevent her from performing the full range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b). (Tr. 20-21.)  As discussed previously, this decision is supported by substantial evidence.

She also claims that it was error for the ALJ not to use a state agency medical consultant in ruling on her physical limitations.  McMillan has not proffered any evidence, nor does this Court find any reason, that this is required.  The ALJ's determination must simply be supported by substantial evidence.  As discussed in the previous sections of this opinion, substantial evidence supports the ALJ's decision. Because McMillan has the RFC to perform light activities, the Medical Vocational Guidelines direct a finding of "not disabled."

## VI.   CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Claimant is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Claimant in her Complaint and Brief in Support of Complaint is **DENIED**.  [Doc. 1, 16]

A separate Judgment will accompany this Memorandum and Order.


Dated this 28th day of March, 2013.


_____/s/ Nannette A. Baker_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

22